

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-7-2000

# Star Enterprise v. Environmental Protection Agency

Precedential or Non-Precedential:

Docket 98-6321

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Star Enterprise v. Environmental Protection Agency" (2000). *2000 Decisions.* Paper 245.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/245

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 7, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6321

STAR ENTERPRISE; TEXACO INC.,

     Petitioners

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

     Respondent

On Petition for Review of a Final Action by
The United States Environmental Protection Agency

Argued July 15, 1999

Before: ROTH and RENDELL, Circuit Judges
POLLAK,1 District Judge

(Opinion filed: December 7, 2000)

William H. Lewis, Jr., Esquire
Michael W. Steinberg, Esquire
 (Argued)
Morgan, Lewis & Bockius LLP
1800 M Street, N.W.
Washington, D.C. 20036-5869

_____

1. Honorable Louis H. Pollak, United States District Court Judge for the
Eastern District of Pennsylvania, sitting by designation.

Jeffrey N. Hurwitz, Esquire
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

 Counsel for Petitioners

Lois J. Schiffer
Assistant Attorney General

Norman L. Rave, Esquire (Argued)
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986

Diane McConkey, Esquire
Office of General Counsel
United States Environmental
Protection Agency

Charles McPhedran
Senior Assistant Regional Counsel
United States Environmental
Protection Agency

 Counsel for Respondent

OPINION OF THE COURT

ROTH, Circuit Judge:

The United States Environmental Protection Agency (EPA) determined that the "Standards of Per formance for Petroleum Refineries," promulgated under the Clean Air Act and codified at 40 C.F.R. SS 60.100-60.109 (1999) (Subpart J), applied to two stationary gas turbines located in an electrical power plant complex in Delaware City, Delaware. The petitioners challenge this determination. Because we conclude that the stationary gas turbines at issue in this case are not "in" a "petroleum r efinery," we hold that these turbines are not "affected facilities" as defined at 40 C.F.R. S 60.100(a) and therefore ar e not subject to regulation under the "Standards of Perfor mance for Petroleum

2

Refineries." For that reason, the EP A erred in determining that these performance standards ar e applicable to the gas turbines at issue in this case.

I. FACTS

Petitioners, Motiva Enterprises, LLC, and Texaco, Inc., challenge a final agency action, issued on July 21, 1998, by the Environmental Protection Agency.2 This final action, entitled "New Source Performance Standards Subpart J Applicability Determination for the Star Enterprise Petroleum Refinery in Delaware City, Delaware," set forth the EPA's conclusion that two stationary gas turbines, owned by Motiva and located in an electrical power plant complex adjacent to Motiva's petroleum r efinery in Delaware City, are subject to regulation under the New Source Performance Standards (NSPS) for Petroleum Refineries, codified at 40 C.F.R. SS 60.100-60.109.

Before addressing the merits of the petitioners' challenge, we will discuss the relevant regulatory framework. The emission of sulfur dioxide (SO2), which causes acid rain and has serious adverse health effects, particularly among asthmatics, is regulated by the EPA under the Clean Air Act. See, e.g., American Lung Ass'n v. Environmental Protection Agency, 134 F.3d 388, 389-90 (D.C. Cir. 1998). Section 111 of the Clean Air Act, codified at 42 U.S.C. S 7411, authorizes the EPA to pr omulgate performance standards for new and modified sources of pollution that the EPA concludes cause or significantly contribute to air pollution. See 42 U.S.C. S 7411(b) (2000). These standards, the NSPS's, must:

> [R]eflect[ ] the degree of emission limitation achievable
> through the application of the best system of emission
> reduction which (taking into account the cost of

_____

2. On October 1, 1998, all assets of Star Enterprise, including the facilities at issue in this case, were transferred to Motiva. Petitioners filed
a motion on July 15, 1999, to formally substitute Motiva for Star Enterprise in this litigation. The motion was unopposed and was granted. Thus, Motiva and Texaco became the petitioners and parties of interest. We refer to both Motiva and Star throughout this opinion as appropriate.

3

achieving such reduction and any nonair quality health and environmental impact and energy r equirements) the Administrator determines has been adequately demonstrated.

42 U.S.C. S 7411(a)(1) (2000). NSPS's apply only to "affected facilities" that were constructed, modified or reconstructed after the publication of the applicable proposed regulation.[3] Each NSPS explicitly defines and describes the"affected facilities" to which it applies.

The EPA has issued NSPS's for over 70 "sour ce" categories. Most of these NSPS's relate to specific industries such as glass manufacturing, see 40 C.F .R. SS 60.290–60.296 (1999), nitric acid manufacturing, see 40 C.F.R. SS 60.70–60.74 (1999), ferroalloy pr oduction, see 40 C.F.R. SS 60.260–60.266 (1999), copper smelting, see 40 C.F.R. SS 60.160–60.166 (1999), and the NSPS at issue here, Subpart J, petroleum refining, see 40 C.F.R. SS 60.100–60.109 (1999). The EPA has also issued NSPS's for generic source categories. These generic source NSPS's apply to specific types of industrial equipment regar dless of the purpose for which the equipment is used. Examples of generic source categories include incinerators, see 40 C.F.R. SS 60.50–60.54 (1999), r ecently constructed fossil-fuel-fired steam generators, see 40 C.F.R. SS 60.40–60.46 (1999), and stationary gas turbines, see 40 C.F.R. SS 60.330–60.335 (1999) (Subpart GG).[4]

NSPS Subpart J, "Standards of Perfor mance for Petroleum Refineries," was designed to r educe SO2 emissions from petroleum refineries. As set forth in S 60.100, the provisions of Subpart J"are applicable to the following affected facilities in petroleum refineries: fluid catalytic cracking unit catalyst regenerators, fuel gas combustion devices, and all Claus sulfur r ecovery plants

_____

3. See 40 C.F.R. S 60.1(a) (1999) ("[T]he provisions of this part apply to the owner or operator of any stationary sour ce which contains an affected facility, the construction or modification of which is commenced after the date of publication in this part of any standard (or, if earlier, the date of publication of any proposed standar d) applicable to that facility.").

4. See supra Part IV C for further on Subpart GG.

4

except Claus plants of 20 long tons per day (L TD) or less." 40 C.F.R. S 60.100(a) (1999) (emphasis added). Subpart J goes on to define a "petroleum refinery" as "any facility engaged in producing gasoline, kerosene, distillate fuel oils, residual fuel oils, lubricants, or other pr oducts through distillation of petroleum or through r edistillation, cracking or reforming of unfinished petr oleum derivatives." 40 C.F.R. S 60.101(a) (1999). At issue in this case ar e two stationary gas turbines, turbines that the EPA contends are "fuel gas combustion devices" and thus "affected facilities" (as set forth in S 60.100(a)), subject to regulation under Subpart J.5

The EPA initially proposed the NSPS for petroleum refineries in 1973 and issued the corr esponding final regulation, what is now Subpart J, on Mar ch 8, 1974. Recognizing that petroleum refineries pr ocess numerous gases that contain significant amounts of hydr ogen sulfide (H2S) and that the uncontr olled combustion of these gases resulted in significant SO2 emissions, the EPA's primary goal in promulgating Subpart J was the r eduction of SO2 emissions from petroleum refineries. Subpart J prohibits the owner or operator of a "fuel gas combustion device" located in a petroleum refinery fr om combusting any "fuel gas" that contains H2S in excess of 230 milligrams per dry standard cubic meter. See 40 C.F .R. S 60.104(a)(1). Compliance with this standard can be established either by monitoring the amount of H2S in the fuel being burned or by monitoring the amount of SO2 emitted from the fuel gas combustion device in question.6

_____

5. The term "fuel gas combustion device" is defined in Subpart J as "any equipment, such as process heaters, boilers and flares used to combust fuel gas, except facilities in which gases ar e combusted to produce sulfur
or sulfuric acid." 40 C.F.R. S 60.101(g) (1999). The term "fuel gas" is further defined in Subpart J as "any gas which is generated at a petroleum refinery and which is combusted." 40 C.F.R. S 60.101(d) (1999).
6. In October 1990, the EPA established an "SO2 equivalence level" to allow regulated entities to monitor the amount of SO2 emitted after combustion in lieu of monitoring the amount of H 2S in the "fuel gas" prior to combustion. See 40 C.F.R.S 60.105(a)(3)(ii) (1999). Based on the investigation "of typical fuel gas compositions and their combustion products," the EPA determined that the "SO2 equivalence level" set forth in S 60.105(a)(3)(ii) (20 parts per million (ppm), dry basis, zero percent excess air) was equivalent to an H2S level of 230 milligrams per dry standard cubic meter. 55 Fed. Reg. 40,171, 40,172 (Oct. 2, 1990).

5

Consistent with the goal of reducing SO2 emissions from petroleum refineries, the definition of "fuel gas" in Subpart J was modified on two separate occasions to exclude gases that do not contain significant amounts of H2S. Originally, in 1974, "fuel gas" was defined as "any gas which is generated by a petroleum refinery pr ocess unit and which is combusted, including any gaseous mixture of natural gas and fuel gas which is combusted." 39 Fed. Reg. 9308, 9315 (Mar. 8, 1974). In March 1979, the EP A modified the definition of "fuel gas" to include:

> [N]atural gas or any gas generated by a petr oleum refinery process unit which is combusted separately or in any combination. Fuel gas does not include gases generated by catalytic cracking unit catalyst regenerators and fluid coking unit coke bur ners.

44 Fed. Reg. 13,480, 13,481 (Mar. 12, 1979). The definition was changed in 1979 to explicitly exclude gases generated by "catalytic cracking unit catalyst regenerators and fluid coking unit coke burners" because such gases do not contain significant amounts of H2S.

By changing the definition of "fuel gas" in 1979, the EPA arguably brought within the scope of the regulation natural gas produced off-site and transported to a petroleum refinery via pipeline. The EPA had not intended to subject such natural gas to regulation under Subpart J because natural gas transported to a petroleum r efinery via pipeline contains only trace amounts of H2S due to specifications established to minimize pipeline corrosion. See 45 Fed. Reg. 13,991, 13,991 (March 3, 1980). The EPA, however, did intend to regulate natural gas that was both pr oduced and combusted on-site at a petroleum refinery:

> In a few cases, however, a refinery may [itself] generate natural gas. There may be no legal or technical requirement that this gas be desulfurized before combustion. If this gas contains appreciable hydrogen sulfide and sulfur constituents, significant emissions of sulfur dioxide would result when it is bur ned. The existing standards of performance were intended to cover these types of gases.

6

Id. The EPA further noted that the "intent of the existing standards of performance for refinery fuel gas has always been to prevent the emissions of sulfur dioxide resulting from the burning of gaseous fuels containing hydrogen sulfide." Id. To clarify this distinction (the distinction between natural gas produced on-site at a petroleum refinery and natural gas transported from an off-site location via pipeline), the EPA proposed revising the first sentence of the definition of "fuel gas" to read: " `Fuel gas' means natural gas generated at a petroleum refinery or any gas generated by a refinery process unit, which is combusted separately or in any combination with any type of natural gas." Id. The EPA ultimately received several comments indicating that this proposed language was confusing because gases produced at a refinery were not generally considered "natural gas" even if their chemical composition was similar to that of natural gas. See 45 Fed. Reg. 79,452, 79,453 (Dec. 1, 1980). In response to these comments, the EPA modified the definition of fuel gas one last time to include "any gas which is generated at a petroleum refinery and which is combusted." Id. The EPA indicated that this final definition was meant to encompass "any gas which has the composition of natural gas." Id.

The stationary gas turbines at issue in this case are to be located in an existing electrical power plant complex adjacent to the Motiva petroleum refinery in Delaware City. This power plant complex was originally owned and operated by Delmarva Power & Light Company.[7] At the time of its construction in the mid-1950's, Delmarva entered into an agreement with Star, Motiva's predecessor in interest, to provide steam and electricity to Star's adjacent petroleum refinery. Delmarva owned and operated the power plant for 35 years. In January 1989, Star exercised its option to purchase the power plant from Delmarva, and actual ownership of the power plant was transferred in January 1992. Following the transfer of ownership, there was no change in the purpose or operation of the power plant, and Delmarva has continued to operate the power plant. In connection with its acquisition of the power plant complex,

_____

7. In 2000, Delmarva changed its name to Conectiv. In this opinion, however, we will continue to refer to the company as Delmarva.

7

Star entered into an agreement with Delmarva to supply electrical power on demand to the Delmarva power grid from one of the boilers in the power plant.

The stationary gas turbines are part of a lar ger project being designed and constructed within the existing power plant complex in Delaware City. This pr oject, known as the Repowering Project, is designed to replace and/or upgrade certain existing power plant units at the power plant complex. Once operational, the Repowering Pr oject will convert high-sulfur petroleum coke produced at Motiva's adjacent petroleum refinery into synthesis gas, which will then be burned in the stationary gas turbines at issue to produce steam and electricity. The steam and electricity will power Motiva's adjacent petroleum refinery; excess electricity will be sold to Delmarva and others on the commercial power grid.

On July 17, 1997, pursuant to 40 C.F.R. S 60.5, Star requested a determination of Subpart J nonapplicability from the EPA Region III office. In essence, Star asked the EPA to issue a ruling stating that Subpart J does not apply to the Repowering Project's stationary gas turbines. Approximately one year later, the EP A responded by issuing an action entitled "New Source Perfor mance Standards Subpart J Applicability Determination for the Star Enterprise Petroleum Refinery in Delawar e City, Delaware" in which the EPA concluded that Subpart J applies to Motiva's Repowering Project, and, more specifically, applies to the two stationary gas turbines that are part of the Repowering Project and will burn synthesis gas to produce steam and generate electricity. In reaching its conclusion, the EPA relied primarily on three facts: (1) the power plant that houses the Repowering Project is adjacent to Motiva's petroleum refinery, (2) the Repowering Project will provide electricity and steam to the Motiva's adjacent petr oleum refinery, and (3) Motiva owns not only the electrical power plant complex which houses the Repowering Pr oject but also the Repowering Project itself and the adjacent petroleum refinery.[8]

_____

8. The EPA also determined that because the aforementioned "synthesis gas," which was to be combusted in the stationary gas turbines at issue

8

The EPA's determination was initially communicated not to Star but to the EPA Region III office. When Star learned of EPA's decision, it sought to withdraw its request for a determination of nonapplicability. However, the State of Delaware asked the EPA for a final determination because certain conditions to the issuance of a state construction permit were based on EPA's decision that Subpart J was applicable to the two stationary gas turbines.

The EPA finalized its determination on July 21, 1998, and Star timely filed petitions for review with both this Court and the U.S. Court of Appeals for the District of Columbia Circuit. On January 19, 1999, the U.S. Court of Appeals for the District of Columbia Circuit granted the EPA's motion to dismiss on venue grounds. The petition then proceeded before us.

## II. JURISDICTION

We have appellate jurisdiction over this petition for review pursuant to S 307(b)(1) of the Clean Air Act. See 42 U.S.C. S 7607(b)(1) (2000). Moreover, we note that despite earlier concerns about the justiciability of the present controversy, we are now persuaded that all the necessary prerequisites to adjudicating this dispute have been met. Indeed, it is undisputed by the parties that the EPA determination at issue is a final agency action, see, e.g., Bennett v. Spear, 520 U.S. 154, 177–78 (1997),9 that the EPA determination

---

in this case, was generated "at" a petroleum refinery, this gas was a "fuel
gas" as defined in Subpart J. See 40 C.F.R. S 60.101(d) (1999). The parties to this action argue extensively as to whether the "synthesis gas" burned in these stationary gas turbines is indeed "fuel gas" and as to whether the stationary gas turbines at issue are "fuel gas combustion devices" as these terms are defined in Subpart J. As discussed infra, we hold today that Subpart J is inapplicable to the stationary gas turbines at issue in this case because the turbines are not located "in" a "petroleum refinery." We therefore need not reach the question of whether the "synthesis gas" burned in these stationary gas turbines is a "fuel gas" or whether these turbines are "fuel gas combustion devices" as these terms are defined in Subpart J.

9. As the Supreme Court noted in Bennett :

9

at issue is ripe for review, see, e.g., Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998),10 and that at least one of the petitioners, Motiva, has standing to challenge the EPA's determination, see, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).11

_____

> [T]wo conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process, Chicago & Souther n Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948)--it must not be of a merely tentative or interlocutory natur e. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget T ransatlantic, 400 U.S. 62, 71
>
> (1970).

Bennett, 520 U.S. 177-78. As the parties concede, and as the facts detailed above clearly indicate, the two conditions set forth in Bennett have been met. Thus, the EPA's determination is a final agency action and is reviewable by this Court.

10. As the Supreme Court stated in Ohio Forestry:

> In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the "fitness of the issues for judicial decision" and the "har dship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967). To do so in this case, we must consider: (1) whether delayed review would cause har dship to the plaintiffs, (2) whether judicial intervention would inappr opriately interfere with
> further administrative action, and (3) whether the courts would benefit from further factual development of the issues presented.

Ohio Forestry, 523 U.S. at 733. As the parties concede, and as the facts detailed above clearly indicate, evaluation of the three factors delineated in Ohio Forestry clearly demonstrates that the EPA's determination is ripe for judicial review.

11. As the Supreme Court held in Lujan :

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains thr ee elements. First, the plaintiff must have suffered an"injury in fact"--an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not `conjectural' or `hypothetical.' " Second, there must be a causal connection between the injury and

III. STANDARD OF REVIEW

A necessary precursor to determining the appropriate standard of review in this case is deter mining whether the agency action in question is an "interpretive rule" or a "legislative rule." Although petitioners contend that the EPA's determination is an "interpr etive rule" rather than a "legislative rule," and thus that the deter mination is entitled to little or no judicial deference, we conclude that the EPA's determination is a legislative rule. See, e.g., Wisconsin Elec. Power Co. v. Reilly, 893 F .2d 901, 904–05 (7th Cir. 1990) (en banc); National–Southwire Aluminum Co. v. EPA, 838 F.2d 835, 838, 841–42 (6th Cir. 1988); Potomac Elec. Power Co. v. EPA, 650 F.2d 509, 513 (4th Cir. 1981).

An agency determination is a "rule" under the Administrative Procedure Act if it is a "statement of general or particular applicability and future ef fect [and] designed to implement, interpret, or prescribe law or policy . . . ." Dia Navigation Co. v. Pomeroy, 34 F.3d 1255, 1263 (3d Cir. 1994) (quoting 5 U.S.C. S 551(4)). Such a "rule" may be an "interpretive rule" or a "legislative rule." Id. at 1264. As we stated in Dia:

> If the rule is based on specific statutory pr ovisions, and its validity stands or falls on the correctness of the

_____

> the conduct complained of--the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . .
> th[e] result [of] the independent action of some third party not before
> the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "r edressed by a favorable decision."

Lujan, 504 U.S. at 560. As the parties concede, and as the facts detailed above clearly indicate, the three requir ements set forth in Lujan have been met with respect to Motiva. Because Motiva has standing to bring suit, we need not reach the question of whether Texaco has met the necessary constitutional and/or prudential standing requirements. See, e.g., Director, Office of Workers' Compensation Programs v. Perini N. River Assocs., 459 U.S. 297, 303–05 (1983); V illage of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 263–64 & n.9 (1977). See generally Lujan, 504 U.S. at 560 (constitutional standing); Hazardous Waste Treatment Council v. Thomas, 885 F.2d 918, 921–27 (D.C. Cir. 1989) (prudential standing).

11

> agency's interpretation of those provisions, it is an interpretive rule. If, however, the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one.

Id. (quoting United Techs. Corp. v. EPA, 821 F.2d 714, 719–20 (D.C. Cir. 1987)).

Courts will reject an agency's interpretive rule if it is contrary to clear congressional intent. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n.9 (1984); American Ambulance Serv. v. Sullivan, 911 F.2d 901, 908 (3d Cir. 1990). If a statute is silent or ambiguous with respect to congressional intent, courts must defer to an agency's determination if the determination is consistent with a per missible construction of the statute. See Chevron, 467 U.S. at 843–45; see Beatty v. Danri Corp., 49 F.3d 993, 997 (3d Cir . 1995). "Varying degrees of deference are accor ded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the natur e of its expertise," Batterton v. Francis, 432 U.S. 416, 425 n.9 (1977), and an interpretive rule is not binding on the agency or this Court, see Armstead v. United States Department of Housing and Urban Development, 815 F.2d 278, 282 (3d Cir. 1987). In contrast, a legislative rule, an agency's interpretation of its own regulation, is "controlling unless `plainly erroneous or inconsistent with the regulation.' " Auer v. Robbins, 519 U.S. 452, 461 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)); see Beatty, 49 F .3d at 997; Rodriguez v. Reading Hous. Auth., 8 F.3d 961, 965 (3d Cir. 1993).

Although the Third Circuit has yet to r eview an EPA determination under the Clean Air Act, the Fourth, Sixth, and Seventh Circuit Courts of Appeals have engaged in such review, with all three Circuits concluding that Congress, through the Clean Air Act, dir ected the EPA to promulgate New Source Perfor mance Standards. See Wisconsin Elec. Power Co., 893 F.2d at 904–905; National–Southwire Aluminum Co., 838 F.2d at 838, 841–42; Potomac Elec. Power Co., 650 F.2d at 513. The Fourth and Seventh

12

Circuit Courts of Appeals have held that EP A determinations made with respect to New Source Performance Standards are controlling unless plainly erroneous or inconsistent with the regulation at issue. See Wisconsin Elec. Power Co., 893 F.2d at 907; Potomac Elec. Power Co., 650 F.2d at 513. The Sixth Cir cuit, in contrast, has held that EPA determinations made with respect to New Source Performance Standar ds are controlling unless "arbitrary, capricious, an abuse of discr etion, or otherwise not in accordance with law." National-Southwire Aluminum Co., 838 F.2d at 836.

Section 111 of the Clean Air Act provides:

> The Administrator shall . . . publish (and fr om time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

42 U.S.C. S 7411(b)(1)(A) (emphasis added). Section 111 further provides:

> Within one year [of making a list accor ding to the above provision], the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. . . . [After opportunity is given for public comments and the comments are considered], he shall pr omulgate . . . such standards with such modifications as he deems appropriate.

42 U.S.C. S 7411(b)(1)(B) (emphasis added).

These provisions clearly indicate that the EP A was directed by Congress to promulgate r egulations necessary to implement the Clean Air Act. Thus, we conclude that EPA determinations interpreting New Source Performance Standards, once handed down, constitute "legislative rules." Consistent with our reasoning in Dia, as well as with Supreme Court jurisprudence and opinions in the Fourth, Sixth, and Seventh Circuit Courts of Appeals, the EPA determination at issue in this case is a "legislative rule,"

13

and therefore must be upheld unless plainly erroneous or inconsistent with Subpart J. See, e.g., Auer v. Robbins, 519 U.S. 452, 461 (1997); Beatty, 49 F.3d at 997; Rodriguez, 8 F.3d at 965.

IV. DISCUSSION

A. Subpart J & "Affected Facilities in Petroleum Refineries"

As detailed above, each New Source Perfor mance Standard promulgated under the Clean Air Act applies to specific "affected facilities," and each New Source Performance Standard explicitly sets forth and defines the "affected facility" or "affected facilities" to which it applies. Consistent with this regulatory framework, Subpart J states in relevant part:

> The provisions of this subpart are applicable to the following affected facilities in petr oleum refineries: fluid catalytic cracking unit catalyst regenerators, fuel gas combustion devices, and all Claus sulfur recovery plants except Claus plants of 20 long tons per day (LTD) or less. The Claus sulfur recovery plant need not be physically located within the boundaries of a petroleum refinery to be an affected facility, provided it processes gases produced within a petr oleum refinery.

See 40 C.F.R. S 60.100(a) (1999) (emphasis added).

In determining that the stationary gas turbines located at Motiva's Repowering Project are fuel gas combustion devices subject to regulation under Subpart J, the EPA concluded that the turbines are "affected facilities" as defined by 40 C.F.R. S 60.100(a). However, as 40 C.F.R. S 60.100(a) expressly indicates, Subpart J does not apply to all "fuel gas combustion devices," but rather applies only to "fuel gas combustion devices" located "in petroleum refineries." Thus, the key question, upon which the outcome of this petition hinges, is: Are the stationary gas turbines here "in" a "petroleum r efinery?"

Subpart J defines a "petroleum refinery" as "any facility engaged in producing gasoline, kerosene, distillate fuel oils, residual fuel oils, lubricants, or other pr oducts through

14

distillation of petroleum or through r edistillation, cracking or reforming of unfinished petr oleum derivatives." 40 C.F.R. S 60.101(a) (1999). While the EPA r eadily concedes that the Repowering Project and the larger electrical power plant complex, in which the Repowering Project is located, are not a "petroleum refinery,"12 the EPA nonetheless contends that the Repowering Project's two stationary gas turbines are "in" a "petroleum refinery" and are subject to regulation under Subpart J.

In originally determining that the stationary gas turbines are subject to regulation under Subpart J, the EPA stated:

> Star's [Repowering] Project is located adjacent to the remainder of the refinery and is under common ownership and control; therefore, it is considered part of the refinery. Further evidence that the[Repowering] Project is integrated into refinery operations is that the [Repowering] Project will supply most of the refinery's steam and all power requirements, has the ability to combust other fuel gas from the refinery, and . . . will help Star manage its solid waste from the r efinery. Because the [Repowering] Project is part of the refinery, fuel gas combustion devices associated with the [Repowering] Project are "in" a refinery and fuel gas generated at the [Repowering] Project is generated at a refinery.

NSPS Subpart J Applicability Determination for the Star Enterprise Petroleum Refinery in Delawar e City, Delaware, Memorandum Dated July 21, 1998 (Star Applicability Determination). In short, the EPA concluded and now contends that because Motiva's Repowering Pr oject "is located adjacent to" a "[petroleum] r efinery [that] is under common ownership and control," it should be"considered part of the [adjacent] refinery," and thus that the stationary gas turbines at issue in this case, turbines that ar e an integral part of the Repowering Project, ar e "in" a "petroleum refinery."

_____

12. It is undisputed that Motiva's Repowering Pr oject is a cogeneration facility that will gasify petroleum coke and combust the resulting synthesis gas to generate only electricity and steam.

15

This reasoning alone cannot, however, provide the basis for concluding that the Repowering Project's stationary gas turbines are subject to regulation under Subpart J. Indeed, were the EPA's reasoning sufficient to establish that the Repowering Project is part of Motiva's adjacent petroleum refinery, it would also be sufficient to establish that any independent, free-standing facility owned by Motiva and built on land adjacent to Motiva's petroleum refinery is part of Motiva's petroleum refinery. For example, EPA's reasoning would also be sufficient to establish that a McDonald's restaurant, owned by Motiva and built on land adjacent to Motiva's petroleum refinery for the convenience of refinery workers, is part of Motiva's adjacent petroleum refinery. Under this interpretation, the EPA would be able to regulate, under Subpart J, fuel gas combustion devices inside the McDonald's. Even though these fuel gas combustion devices would not be located "in" a "petroleum refinery," such devices would be subject to regulation under Subpart J under the EPA's interpretation because they would be treated as "affected facilities in [a] petroleum refinery[ ]."

Were we to accept the EPA's reasoning (assuming "common ownership and control"), any fuel gas combustion device located in a facility adjacent to Motiva's petroleum refinery would be subject to regulation under Subpart J because such devices would be treated, inappropriately, as "affected facilities in [a] petroleum refinery[ ]." This conclusion is untenable.

As detailed above, it is undisputed that Motiva's Repowering Project is a cogeneration facility that will gasify petroleum coke and combust the resulting synthesis gas to generate electricity and steam. Moreover, even though Motiva's Repowering Project is adjacent to a petroleum refinery that Motiva owns, the Repowering Project is located in a free-standing building, an electric power plant complex that is physically separate and distinct from Motiva's petroleum refinery. Neither the Repowering Project nor the electric power plant complex in which the Repowering Project is to be constructed and operated is a "petroleum refinery." We therefore fail to understand how the EPA concluded and now contends that the Repowering Project's

16

stationery gas turbines are themselves "in" a "petroleum refinery." Furthermore, if these turbines are not "in" a "petroleum refinery," they ar e not "affected facilities" and thus are not subject to regulation under Subpart J.

The EPA also argues that the Repowering Project will be an integral part of the refinery's operations and for that reason the stationary gas turbines at issue ar e "in" a "petroleum refinery." The EP A asserts that:

> [The Repowering Project] will take low value material from the refinery, i.e., petr oleum coke, convert it into a different low value material, i.e. , a combustible gas, burn the gas in a combustion turbine, and use the steam and electricity produced by the turbine to provide energy for other refinery processes. The [Repowering] Project is thus a integral part of the refinery's operations both because it is part of the refinery's process of manufacturing usable products from crude oil and because it uses refinery products to provide a valuable input, i.e. ener gy [in the form of electricity and steam] to the refinery's operation.

Star Applicability Determination. While much of the above is accurate, the Repowering Project is neither part of the adjacent petroleum refinery nor necessary to the refinery's operations. Indeed, as the EPA concedes, Motiva could as easily have chosen to power its refinery by purchasing electricity from the local electric company's commercial grid.13

If we were to follow the EPA's reasoning that the Repowering Project is part of Motiva's adjacent petroleum refinery, we would also be requir ed to conclude that any building that is located on land adjacent to Motiva's petroleum refinery and has a mutually beneficial relationship with the petroleum refinery -- be it to provide food to the workers or energy to the machinery-- is part of the petroleum refinery. Following this r easoning, the EPA would be able to regulate facilities within any such building as if they were located "in" the petr oleum refinery.

_____

13. As we have already noted, Motiva's Repowering Project produces more than enough electricity to power the adjacent petroleum refinery and that surplus electricity will be sold to Delmarva and/or other customers on the commercial power grid.

The EPA acknowledges that the term "petroleum refinery" is clearly defined in Subpart J as "any facility engaged in producing gasoline, kerosene, distillate fuel oils, residual fuel oils, lubricants, or other products thr ough distillation of petroleum or through redistillation, cracking or reforming of unfinished petroleum derivatives." 40 C.F.R. S 60.101(a). Moreover, the EPA concedes that Motiva's Repowering Project is a cogeneration facility that generates only electricity and steam and that the Repowering Pr oject resides in a separate, free-standing electric power plant complex. The EPA also concedes that none of the processes described in the definition of "petroleum refinery" set forth in S 60.101(a) takes place as a part of the Repowering Project or even within the building in which the Repowering Project resides. Nonetheless, the EP A contends that a "broad definition" of "petroleum refinery" to include operations essential to its purpose is consistent with the language of Subpart J. Using this broad definition, the EPA concluded:

> The Star [petroleum] refinery is engaged in the processes described in the NSPS Subpart J definition of "petroleum refinery." The [Repowering] Project is an integral part of the refinery. It gasifies coke generated by refinery process units, producing synthesis gas, combusts the synthesis gas and is also capable of combusting other types of refinery fuel gas. The sulfur compounds (mainly H2S) stripped during the gasification process will be sent to the modified Claus sulfur recovery plant. The steam and most of the electricity produced by the project will be routed back to other refinery process units.

Star Applicability Determination. The EPA's reasoning is flawed because the Repowering Project is not essential to the operation of Motiva's petroleum refinery. Were the Repowering Project essential to the operation of the refinery, the EPA might be able to convince us that the Repowering Project was part of Motiva's petr oleum refinery and that the stationary gas turbines located in the Repowering Project are "in" a "petroleum refinery." However, as mentioned above, Motiva does not need electricity from the Repowering Project to power its refinery. Motiva could

18

just as easily purchase electricity from the local power company. Nor is the Repowering Project necessary for coke disposal. Rather than using the petroleum coke, produced in its refinery, to power the turbines at issue here, Motiva could ship the coke off-site for use at other industrial facilities or for disposal. Indeed, because Motiva's petroleum refinery operated for many years prior to the conception of the Repowering Project, it is hard to understand how the EPA concludes that the Repowering Project is essential to the operation of the adjacent petroleum refinery.14 Moreover, the EPA's claim that "[i]f the current power plant did not exist, Star would not be able to operate the refinery at its current capacity" is also inaccurate for the reasons articulated above. Presumably, the only limitations on refinery capacity would be limitations on available power and available raw materials. The Repowering Project in no way affects the availability of raw materials, and although the Repowering Project would supply power to Motiva's petroleum refinery, Motiva could just easily purchase that power (and any additional power needed) from a commercial supplier.

Finally, in support of its initial determination, the EPA contends that:

> The coke gasification project is not a stand-alone facility. . . . In Star's case, the refinery in its current form could not operate without the current "power plant" or without the planned Project, and it is not likely that the current "power plant" or planned Project would exist (they certainly would not exist in their current or planned form) without the remainder of the refinery.

_____

14. Were we to accept the EPA's logic, if Motiva purchased electricity from the local electric company, generated by a generator located in a free-standing building on land adjacent to its petroleum refinery, and then, at a later date, Motiva purchased outright the entire local electric company, any stationary gas turbines that were a part of the aforementioned generator facility would (quite suddenly) become subject to regulation under Subpart J, since these turbines would be literally transformed into "affected facilities in [a] petroleum refinery[ ]." This sort
of reasoning, and the outcome dictated by it, are untenable.

19

Star Applicability Determination. For the same reasons detailed above, this argument is unpersuasive. Put simply, the Repowering Project is a stand-alone facility and could operate absent the existence of Motiva's petr oleum refinery by obtaining petroleum coke from another commercial supplier (rather than Motiva's adjacent petr oleum refinery) and selling all of the steam and electricity pr oduced by the Repowering Project to commercial customers such as Delmarva.

While it is undisputed that a mutually beneficial relationship exists between Motiva's Repowering Project and Motiva's petroleum refinery, the EP A's determination that the stationary gas turbines at Motiva's Repowering Project are subject to regulation under Subpart J is not only plainly erroneous but also inconsistent with the language of Subpart J itself. In short, the EPA's deter mination that the stationary gas turbines at Motiva's Repowering Pr oject are "affected facilities" subject to r egulation under Subpart J ignores the requirement that r egulated turbines be located "in" a "petroleum refinery."

B. Physical Location as the Touchstone of S 60.100(a)

Despite the EPA's arguments to the contrary, in determining what facilities are "af fected facilities" that can be regulated under Subpart J, and, specifically, in determining what facilities are "in petroleum refineries," the touchstone of such a determination is the physical location of the facilities in question. As noted above, 40 C.F.R. S 60.100(a) states:

> The provisions of this subpart are applicable to the following affected facilities in petroleum refineries: fluid catalytic cracking unit catalyst regenerators, fuel gas combustion devices, and all Claus sulfur recovery plants except Claus plants of 20 long tons per day (LTD) or less. The Claus sulfur recovery plant need not be physically located within the boundaries of a petroleum refinery to be an af fected facility, provided it processes gases produced within a petr oleum refinery.

40 C.F.R. S 60.100(a) (1999) (emphasis added). For the last sentence of S 60.100(a) to make any sense, the ultimate question to be answered when determining whether certain

20

facilities are "in petroleum refineries" must be: Where are the facilities physically located?

Although the EPA argues strenuously that the term "petroleum refinery" must be interpreted broadly to include not only Motiva's petroleum refinery but also an adjacent, free-standing, independent electric power plant complex that produces steam and electricity for use by the refinery (as well as other commercial customers including the local power company), the stationary gas turbines in this free-standing, independent facility are simply not"in" a "petroleum refinery" because neither the Repowering Project nor the electric power plant complex in which the Repowering Project is located engages in the pr oduction of "gasoline, kerosene, distillate fuel oils, r esidual fuel oils, lubricants, or other products through distillation of petroleum or through redistillation, cracking or reforming of unfinished petroleum derivatives." 40 C.F .R. S 60.101(a) (1999). Moreover, the explicit inclusion in S 60.100(a) of Claus recovery plants "not . . . physically located within the boundaries of a petroleum refinery," and the corresponding absence of a similar inclusion with respect to"fuel gas combustion devices" "not . . . physically located within the boundaries of a petroleum refinery," further undermines the EPA's determination.

C. Chemical Composition of Synthesis Gas Bur ned in
      the Stationary Gas Turbines

Although our determination that Subpart J does not apply here frees us from having to determine whether the synthesis gas to be burned by the stationary gas turbines is a "fuel gas" regulated under Subpart J, we do note that the chemical composition of the synthesis gas is markedly different from the chemical composition of other fuel gases, the burning of which is subject to regulation under Subpart J. As the petitioners highlight in their brief, and as the regulatory history of Subpart J suggests, the exclusive focus and purpose of Subpart J is the reduction of sulfur emissions (specifically sulfur dioxide ($SO_2$) emissions) by limiting the amount of hydrogen sulfide ($H_2S$) in combustible fuel gases combusted in petroleum r efineries. According to Motiva, a not insignificant amount of the sulfur/$SO_2$, emitted when the synthesis gas at issue is

21

combusted in these turbines, comes not from H 2S in the synthesis gas but from COS in the synthesis gas.

Regardless of the exact source of the sulfur/SO2 emissions, it appears from the recor d that at least some of the sulfur/SO2 emitted when the synthesis gas at issue is combusted comes not from H2S in the gas but rather from COS in the gas. As mentioned above, compliance with Subpart J can be established either by measuring and monitoring the H2S level in the fuel gas prior to combustion or by measuring and monitoring the SO2 level in the emissions after combustion. See supra, note 4. If subject to regulation under Subpart J, Motiva is without a legally acceptable method for measuring the combined concentration of COS and H2S in the pre-combustion synthesis burned at the Repowering Project. Therefore, Motiva will be forced either to monitor and r educe the emission of SO2, or to monitor and control the level of H2S in the pre-combustion synthesis gas being combusted at the Repowering Project (rather than the level of H2S and COS in the pre-combustion synthesis gas), even though by itself, the level of H2S in the synthesis gas being combusted is an arguably poor and clearly inferior measure of Motiva's compliance with Subpart J. As the EPA points out, the unique chemical composition of the synthesis gas, in and of itself, does not and would not exempt the stationary gas turbines at issue here from regulation under Subpart J. This composition may suggest, however, that another regulation, for example, Subpart GG,15 regulating stationary gas turbines, rather than Subpart J, may be the

_____

15. 40 C.F.R. S 60.330, entitled"Applicability and Designation of Affected Facility," is the first section of Title 40, Subpart GG, and states in relevant part:

> (a) The provisions of this subpart ar e applicable to the following affected facilities: All stationary gas turbines with a heat input at peak load equal to or greater than 10.7 gigajoules per hour, based on the lower heating value of the fuel fir ed.

> (b) Any facility under paragraph (a) of this section which commences construction, modification, or r econstruction after October 3, 1977, is subject to the requir ements of this part . . . .

40 C.F.R. S 60.330 (1999). It is undisputed by the parties that Subpart GG applies to the stationary gas turbines at issue in this case. The parties dispute only the applicability of Subpart J, which imposes much more stringent requirements than does Subpart GG on emissions from these stationary gas turbines.

appropriate regulation under which to r egulate emissions from these gas turbines. The discontinuity between the chemical composition of synthesis gas to be combusted at the Repowering Project and the chemical composition of other fuel gases, the combustion of which is subject to regulation under Subpart J, also suggests that the EPA's determination is "inconsistent with the r egulation" at issue and should be set aside.[16]

D. EPA's Prior Determination Under Subpart OOO

In arguing that its determination in this case is neither plainly erroneous nor inconsistent with Subpart J, the EPA relies in part on what it characterizes as a prior, analogous determination under Subpart OOO--Standar ds of Performance for Nonmetallic Mineral Pr ocessing Plants.[17] The EPA's reliance on this determination is misplaced for two reasons.

First, while the factual background of the EP A's earlier determination under Subpart OOO is not entir ely clear (the record is incomplete), it is clear that the facts of this earlier determination are distinguishable, in at least one key respect, from the facts in this case. Unlike the stationary gas turbines at issue here, the Cement T reated Base plants located at nonmetallic mineral processing plants were portable. This fact alone distinguishes the EP A's prior determination under Subpart OOO because, as discussed above, physical location is the touchstone for deter mining which facilities are "affected facilities" as the term is defined in Subpart J. Because the Cement Treated Base plants at issue in this prior determination were portable, had the EPA concluded that these Cement Tr eated Base plants were subject to regulation under Subpart OOO based on their physical location, the regulatory framework established by

_____

16. We further note that Motiva's inability to monitor and control the level of H2S and COS (prior to combustion) in the gas being combusted at the Repowering Project would take on heightened significance if it could be shown that monitoring the post-combustion SO2 emissions was more costly than monitoring the pre-combustion level of H2S in the synthesis gas at issue.

17. See Standards of Perfor mance for Nonmetallic Mineral Processing Plants, 40 C.F.R. SS 60.670-60.676 (1999).

23

Subpart OOO could have been easily circumvented simply by moving the Cement Treated Base plants. Phrased differently, when portable facilities are at issue, physical location cannot possibly be the touchstone for determining if, and/or when, regulation is appropriate. This obvious consequence of portability is, of course, irrelevant in the present case because the gas turbines here are stationary.

Second, and more importantly, even assuming, arguendo, that the facts surrounding the prior determination under Subpart OOO and the present determination under Subpart J are sufficiently analogous, this in no way implies that the EPA's prior determination under Subpart OOO was either correct or consistent with Subpart OOO. Neither this Court nor any other court of which we are aware has addressed the propriety and/or legality of this prior determination upon which the EPA relies in part. As such, even assuming that the facts surrounding this prior determination under Subpart OOO and the present determination under Subpart J are sufficiently analogous, we can only conclude from this that the EPA has addressed the issues consistently, not correctly.18

V. CONCLUSION

It well-established, as a general proposition, that the EPA's interpretation of its own regulations is entitled to "great deference." As the Supreme Court stated in Udall v. Tallman:

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. . . . [Moreover, w]hen the construction of an administrative regulation rather

_____

18. The parties argue extensively as to whether subjecting the stationary gas turbines at issue in this case to regulation under Subpart J would "yield . . . any environmental benefits." As discussed supra, we hold today that Subpart J is inapplicable to these stationary gas turbines because the turbines are not located "in" a "petroleum refinery." We therefore need not reach the question of whether subjecting the turbines at issue in this case to regulation under Subpart J would "yield . . . any environmental benefits."

24

than a statute is in issue, deference is even more clearly in order.

Udall v. Tallman, 380 U.S. 1, 16 (1965). Such deference, however, is not without limitations. The EP A determination at issue in this case seemingly ignores the r equirement, set forth at 40 C.F.R. S 60.100(a) (1999), that "affected facilities" regulated under Subpart J be located "in [a] petroleum refinery." In light of this, we conclude that the EPA's determination is both "plainly erroneous," and inconsistent with Subpart J. We will ther efore grant Motiva's petition for review and vacate the EP A's Determination.

A True Copy:
Teste:

Clerk of the United States Court of Appeals for the Third Circuit

25